Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

**FILED**

May 23 2013, 8:30 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL R. FISHER**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANGELA N. SANCHEZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| KRISTOL TOMS, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | ) No. 49A05-1211-CR-585 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Mark D. Stoner, Judge
The Honorable Jeffrey L. Marchal, Master Commissioner
Cause No. 49G06-1107-FC-49497

**May 23, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Kristol Toms appeals the revocation of her placement in community corrections for committing a new offense and violating the terms of her placement. Toms raises one issue, which we revise and restate as:

I. Whether the evidence is sufficient to revoke Toms's placement in the community corrections program; and

II. Whether the court violated Toms's due process rights in revoking her placement.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In December 2011, pursuant to a plea agreement, Toms pled guilty to intimidation as a class C felony and theft as a class D felony. In January 2012, the court sentenced Toms to concurrent terms of four years for the class C felony and 545 days for the class D felony. The court ordered that Toms would serve 180 days in the Department of Correction followed by 1,280 days on community corrections work release and to comply with all rules, regulations, treatment recommendations, and procedures of community corrections.

On October 2, 2012, a Notice of Community Corrections Violation was filed alleging that, since Toms's arrival at Volunteers of America - Theodora House on July 9, 2012, Toms had received two conduct reports. The Notice alleged that Toms "was issued a conduct report for Threatening: Communicating to another person a plan to physically harm, harass, or intimidate that person or someone else." Appellant's Appendix at 68. The Notice further alleged that, on another day, Toms "received a second conduct report for Use/Possession of Tobacco and Unauthorized Possession of Food Items." Id. The Notice stated that Toms was actively participating in mental health treatment and was

2

taking her medications as prescribed. The Notice further provided that "[a]t this time, due to the incident regarding allegations of threatening, Theodora House is requesting [Toms's] removal from the facility." Id.

On October 25, 2012, the court held an evidentiary hearing at which the parties presented evidence and arguments. The State presented the testimony of Monet Orr, a case manager at Theodora House, regarding the conduct reports related to Toms. Orr testified that Toms violated "B231," a "B offense," when "she threatened – communicated to another CO that she was going to physically harm, intimidated her in the process of an incident." Transcript at 4, 9. Orr testified that she read the entire conduct report to Toms and that Toms admitted to the conduct and felt bad about it. Orr indicated that this type of conduct was previously communicated as being unacceptable. Orr further indicated that Toms was serving her sentence in a mental health component of the Theodora House, "had been diagnosed with bipolar and depression," and was currently attending her treatments and taking her medications. Id. at 6.

The court asked Orr about the specific nature of the threat, Orr offered to read the conduct report, and the court agreed. The report stated that in September 2012 Toms "approached Station A to sign out on a job search pass to Burger King," that "this writer [Ms. Graham] made contact with Burger King to see if they were hiring" and "Burger King only accepts applications online," and that "[t]his writer informed Toms of this information." Id. at 6-7. The report provided that "Toms got upset and started saying this MF'g place is getting on her nerves and that she would walk out this door and that this writer was always F'g with her." Id. at 7. The report stated "[t]his writer gave resident Toms a direct order to return to her dorm room," that "Toms stated that she was

3

not going to her dorm room," and that "[i]nstead resident Toms picked up the pay phone on the east end of the building, in hearing distance of this writer in Station A, stating that she would not be able to take her pass out because this B---- had called Burger King and they said only online." Id. The report further provided: "Then she, Toms, said I know meddling B----, she is just a desk clerk, not a case manager. As resident Toms continued to talk, she . . . also stated that she was going to kick Ms. Graham's MF'g A-S-S. Yeah, she thinks I won't kick her A-S-S but I will." Id. The report stated that "[a]t this time, this writer called supervisor [] Washington to come to Station A because the situation was getting out of control." Id.

The court then asked Orr about the allegation regarding the second conduct report, and Orr testified that "those instances are C offenses and . . . it stated that the CO Washington saw [] Toms place the bag of food behind the iron fence," that Toms "was out . . . with her child at the playground and . . . there was a gentleman that came and brought food over by the fence," that "[t]here's a fence that cuts off our area and the gas station is behind it," that "[t]he gentleman basically brought over food and other items over the fence," and that "Toms took possession of those items and also was found with cigarettes at the time, smoking on the playground." Id. at 8. Orr indicated that this conduct was a violation of the rules, that the tobacco and food violations were considered class C offenses, that it would take four class C offenses before a violation was filed, and that Toms had a "B offense and it's threatening and that's a very serious offense." Id. at 9.

Toms then testified and, when asked by her counsel whether she "admit[ted] to this officer that you said these things," responded affirmatively and indicated that she had

4

apologized.  Id. at 10.  Toms testified that she talked to Graham about the incident, that Toms apologized to Graham, and that Graham apologized to her "for checking on the um, calling and she was like she won't do it again."  Id.  Toms indicated that, when she made the comments on the phone, she was not talking directly to Graham, that she "didn't do anything to her," and that she did not "mean it."  Id. at 11.

The court took judicial notice of the fact that Toms was on a community corrections sentence in part due to her conviction for intimidation.  The court then found Toms in violation of her community corrections placement as the State had proven that she violated the rules of the Theodora House.  The court issued a written order finding that "[b]ased upon the evidence presented the Court finds that [Toms] has violated the terms of her placement as specified in allegation one (1) of the Notice of Community Corrections Violation by threatening physical harm on a [] Theodora House staff member and by possessing tobacco and certain food items without authorization of the work release facility."  Appellant's Appendix at 69.  The court found that allegation was proven by a preponderance of the evidence, revoked Toms's placement in community corrections, and ordered that Toms serve the previously-suspended portion of her sentence in the Department of Correction.  The court awarded Toms credit for days served while incarcerated in the Marion County Jail and Marion County Community Corrections and credit time.

DISCUSSION

I.

The first issue is whether the evidence is sufficient to revoke Toms's placement in the community corrections program.  Toms contends that the only evidence was the

5

testimony of a case manager at the facility where she was placed summarizing a report of another worker, that the report "showed only that [] Toms, who was in a mental health component at the facility, [] was overheard in a phone call to a third party saying she would 'kick [the worker's] ass,'" and that "[s]uch a statement to a third party cannot be considered a threat of violence to the worker." Appellant's Brief at 4-5. Toms argues that "[i]t is clear from the evidence that no threat was directly communicated to the staff member," that "[a]lthough the phone conversation was within earshot of that staff member, the record does not disclose whether the comment was intended to be heard by the facility worker or whether that worker was eaves dropping [sic] on the phone conversation," and that "[i]n any event the comment was directed to a third party, so there is no showing [] Toms ever told the staff employee she was going to cause any harm to her." Id. at 6-7. Toms further argues that the State did not present evidence of the rules of the facility or the rule Toms was alleged to have violated, that "it is reasonable to require that any threat of violence actually be made to the person at whom it is directed," and that "[e]vidence of comments to a third party in an overheard phone conversation is not the substantial evidence of probative value required to support the revocation." Id. at 7.

The State maintains that the evidence is sufficient to sustain the revocation of Toms's placement, that Toms admitted to making the statements in question, that the report filed by Graham described how Toms became angry after she refused to give her permission to leave the facility, that Toms "said the facility was on her nerves, threatened to leave, accused Graham of 'always F'g with her,'" refused Graham's order to return to her room, and "went to a nearby payphone instead." Appellee's Brief at 7. The State

6

argues that, while Toms claims she did not make the statements while talking into the payphone directly to Graham or intend to act on them, "the description of Toms's violation was defined in the Notice of Community Corrections Violation as '[c]ommunicating to another person a plan to physically harm, harass, or intimidate that person or someone else,'" and that Toms's "conduct clearly fits this definition." Id. The State also argues that the trial court could reasonably conclude that Toms did intend for Graham to hear the comments Toms made on the phone and for her to be threatened or intimidated by them, that Toms had already made hostile statements directly to Graham, and that Toms made the statements on the phone immediately after a confrontation and within earshot of Graham. The State further asserts that Toms does not dispute on appeal the second violation alleged in the Notice of Community Corrections Violation related to the use and possession of tobacco and unauthorized food items.

Placement in community corrections is at the sole discretion of the trial court. Toomey v. State, 887 N.E.2d 122, 124 (Ind. Ct. App. 2008) (citing Ind. Code § 35-38-2.6-3(a) (a court "may . . . order a person to be placed in a community corrections program as an alternative to commitment to the department of correction")). Ind. Code § 35-38-2.6-5 provides:

> If a person who is placed under this chapter violates the terms of the placement, the court may, after a hearing, do any of the following:
>
> (1)     Change the terms of the placement.
>
> (2)     Continue the placement.
>
> (3)     Revoke the placement and commit the person to the department of correction for the remainder of the person's sentence.

7

For purposes of appellate review, we treat a hearing on a petition to revoke a placement in a community corrections program the same as we do a hearing on a petition to revoke probation. Holmes v. State, 923 N.E.2d 479, 482 (Ind. Ct. App. 2010) (citing Cox v. State, 706 N.E.2d 547, 549 (Ind. 1999), reh'g denied). A defendant is not entitled to serve a sentence in either probation or a community corrections program. Id. Rather, placement in either is a "matter of grace" and a "conditional liberty that is a favor, not a right." Id. (citing Cox, 706 N.E.2d at 549 (quoting Million v. State, 646 N.E.2d 998, 1002 (Ind. Ct. App. 1995) (internal quotation omitted))). Thus our standard of review of an appeal from the revocation of a community corrections placement mirrors that for revocation of probation. Id. at 483 (citing Cox, 706 N.E.2d at 551). A probation hearing is civil in nature and the State need prove the alleged violations only by a preponderance of the evidence. Cox, 706 N.E.2d at 549. We will consider all the evidence most favorable to supporting the judgment of the trial court without reweighing that evidence or judging the credibility of witnesses. Id. If there is substantial evidence of probative value to support the trial court's conclusion that a defendant has violated any terms of probation, we will affirm its decision to revoke probation. Id. The violation of a single condition is sufficient to revoke probation. Wilson v. State, 708 N.E.2d 32, 34 (Ind. Ct. App. 1999). We have observed that the commission of a crime while serving time in the community corrections program is always grounds for revocation, even if the sentencing court fails to notify the person of such condition, because persons in the program should know that they are not to commit additional crimes during their placement. Toomey v. State, 887 N.E.2d 122, 125 (Ind. Ct. App. 2008) (citing Decker v. State, 704 N.E.2d 1101, 1103 (Ind. Ct. App. 1999), trans. dismissed).

8

Here, the record shows that Toms violated the rules of the Theodora House. Orr testified that she read the entire conduct report related to Toms's interaction with Graham and comments immediately afterwards on the phone to Toms and that Toms admitted to the conduct. Orr also indicated that the conduct was previously communicated as being unacceptable. The conduct report stated that, after Graham informed Toms that Burger King accepted applications online only, Toms became "upset and started saying this MF'g place is getting on her nerves and that she would walk out this door" and that Graham "was always F'g with her." Transcript at 7. Toms then went to a payphone which was within the hearing distance of Graham's station and stated, referring to Graham, that "I know meddling B----, she is just a desk clerk, not a case manager," that "she was going to kick Ms. Graham's MF'g A-S-S," and "she thinks I won't kick her A-S-S but I will." Id. We also observe that, on appeal, Toms does not assert that the evidence presented by the State was insufficient to show that she possessed tobacco and certain food items without authorization in violation of the rules of Theodora House.

Based upon the facts most favorable to the trial court's judgment, we conclude that the trial court as the finder of fact could reasonably find by a preponderance of the evidence that Toms violated the rules of her placement in community corrections. We conclude the trial court did not err or abuse its discretion in revoking Toms's placement in community corrections and ordering her to serve the previously-suspended portion of her sentence in the Department of Correction. See Toomey, 887 N.E.2d at 124-125 (holding the defendant violated the terms of his community corrections placement and affirming the revocation of the defendant's community corrections placement and commitment to the Department of Correction to serve his sentence).

II.

The next issue is whether the court violated Toms's due process rights in revoking her placement. Toms asserts that the trial court's oral and written statement revoking placement was inadequate and did not afford her due process of law. Toms argues that the trial court's written and oral statement fail to cite the evidence relied on or the reasons for revoking the placement, that "simple due process would require disclosure of the specific evidence upon which the court relied," and that, "in view of the fact that [she] was placed in a mental health unit [], it seems especially important to know whether the court took into consideration the mental health issues of [] Toms and what impact they [sic] had on the decision to revoke her placement." Appellant's Brief at 8-9. The State maintains that the trial court's revocation statement satisfied due process, that the court's written statement "clearly shows that the court revoked [Toms's] placement because it found that she had threatened [Toms's] case manager and also because she possessed contraband items," that "[o]f the two violations detailed in the transcript, one was expressly admitted, and the other went unrefuted," and that it is "abundantly clear what reason the court had for revoking [Toms's] placement at the Theodora House, and due process was satisfied." Appellee's Brief at 10.

As previously stated, for purposes of appellate review, we treat a hearing on a petition to revoke a placement in a community corrections program the same as we do a hearing on a petition to revoke probation. Cox, 706 N.E.2d at 549. Although probationers are not entitled to the full array of constitutional rights afforded defendants at trial, the Due Process Clause of the Fourteenth Amendment does impose procedural and substantive limits on the revocation of the conditional liberty created by probation.

10

Woods v. State, 892 N.E.2d 637, 640 (Ind. 2008). The minimum requirements of due process that inure to a probationer at a revocation hearing include: (a) written notice of the claimed violations of probation; (b) disclosure of the evidence against him; (c) an opportunity to be heard and present evidence; (d) the right to confront and cross-examine adverse witnesses; and (e) a neutral and detached hearing body. Id.

Due process requires a written statement by the fact finder regarding the evidence relied upon and the reasons for the revocation. Washington v. State, 758 N.E.2d 1014, 1018 (Ind. Ct. App. 2001). This requirement may be satisfied by placement of the transcript of the evidentiary hearing in the record if the transcript contains a clear statement of the trial court's reasons for revoking probation. Id.

Here, the transcript of the October 25, 2012 evidentiary hearing discloses that Orr testified as to the two conduct reports related to the allegations against Toms and read the report related to the statements made by Toms directly to the Theodora House worker and by Toms on the phone about the worker. Orr and Toms were questioned by counsel for both parties and by the court. The transcript further shows that the court verbally found Toms in violation of her community corrections placement as the State had proven that she violated the rules of the Theodora House. The court also issued a written order finding that "[b]ased upon the evidence presented the Court finds that [Toms] has violated the terms of her placement as specified in . . . the Notice of Community Corrections Violation by threatening physical harm on a [] Theodora House staff member and by possessing tobacco and certain food items without authorization of the work release facility." Appellant's Appendix at 69.

11

Based upon the transcript and the trial court's order, we conclude that the court did not fail to provide an adequate written statement and that reversal on this basis is not warranted.  See Washington, 758 N.E.2d at 1018 (noting that the transcript of the revocation hearing had been placed in the record and clearly disclosed the court's basis for revoking the defendant's probation).

CONCLUSION

For the foregoing reasons, we affirm the trial court's revocation of Toms's placement in community corrections.

Affirmed.

RILEY, J., and BRADFORD, J., concur.